[No. 3240.]

## JIM FLETCHER *v.* THE STATE.

THEFT—OWNERSHIP—INTENT—EVIDENCE—FACT CASE.—See the statement
of the case for evidence *held* insufficient to sustain a conviction for theft,
inasmuch as it fails to establish the ownership of the stolen property
when it was taken, as alleged in the indictment; and because it fails to
establish that the property was taken with a fraudulent intent to appro-
priate, etc.

APPEAL from the District Court of Johnson.   Tried below be-
fore the Hon. Jo. Abbott.

The indictment charged the theft of two horses, the property of H. W. Keiningham, in Johnson county, on the thirtieth day of July, 1883. The trial resulted in the appellant's conviction, and his punishment was affixed at a term of five years in the penitentiary.

H. W. Keiningham was the first witness for the State. He testified that he had long been a resident of Ellis county, Texas. In 1883 the witness owned a black mare and colt. The mare was branded WP on the thigh and JN on the shoulder. She also had an indistinguishable brand on the neck. One of her hind legs was enlarged. She was about fifteen hands high. The colt was branded with a "lazy T"—that is, a T lying horizontally instead of standing perpendicular. About the last of July or the first of August, 1883, the said mare and colt were running at large on the range on Onion creek, near the witness's home in Ellis county. About that time they disappeared, and the witness knew nothing of them until he learned through Captain Plummer that they were in Johnson county. The witness's son bought the mare from Marchbanks, who lived at or near Waxahachie. Onion creek is about one and a half miles distant from witness's house, and Waxahachie creek is about five miles. Witness heard that the defendant had the animals in Johnson county, and wrote him to that effect, and further that he had plenty of proof in both Ellis and Johnson counties to show that he, the defendant, took them from this county. Witness at the same time wrote him that if he had taken the animals through a mistake and would return them, it would be all right; otherwise, that he, witness, would prosecute. The letter exhibited is the letter the witness received from the defendant in reply. In that letter the defendant said that he did not know the witness claimed the mare and colt, and that the animals had run off and he had never recovered them.

Mr. Reynolds testified, for the State, that he lived in the neighborhood of Keiningham, in Ellis county. In July or August, 1883, the defendant rode up to witness's hog pen, having in his possession at the time a black mare and colt, the animals branded as stated by Keiningham. Witness asked the defendant if he had recently traded for the two animals. He replied that he had owned the mare for some time, but that some one had branded his colt, and he would like to find out who it was. Witness told him that it was his understanding that the mare belonged to Mr. Keiningham, and that he knew the brand on the ·

colt to be Keiningham's brand, and that if he would see Kein-ingham he would be able to find out all about it. Defendant made no reply, but rode off in the direction of the big road, the north end of which led to Waxahachie, and the south end by Keiningham's house. Witness did not know which end the defendant took. Witness saw another man some distance off from the hog pen, with two or three horses. The colt had been cut, evidently by a wire fence.

Mr. Morgan testified, for the State, that in June, 1883, the de-fendant staid all night at his house in Ellis county. Next morn-ing defendant said that he had a mare in the UP brand running on Onion creek, in Ellis county, and showed the witness a bill of sale, which he said was for that brand. Witness could not read much, but thought the bill of sale called for the UP brand on the shoulder. The defendant left witness's house that morn-ing, saying he was going to Onion creek to look for that mare. About noon defendant returned to witness's house and said that he had found the mare but could not drive her, and wanted wit-ness to go with him and help drive her. Witness could not go, and defendant proposed that he would work for witness that evening if witness would aid him next morning. Witness agreed.

Witness went with the defendant next morning, and they found the mare. She had a colt, evidently foaled the night be-fore. It could not travel. The mare was a black animal, about fifteen hands high, branded UP on the thigh and JN on the shoulder. She had an enlarged leg, and wore a piece of rope on her neck. Witness advised the defendant not to take the mare, as he believed she belonged to some one in the neighborhood. Defendant replied that he would come back some time and take her when nobody would know it. He did not take the mare then, but in the latter part of July he and his brother John came to witness's house, remained over night, and left next morning, saying they were going to get the mare on Onion creek. Wit-ness told the defendant that he had learned that the mare be-longed to Keiningham. Defendant replied that he had bought the mare, and was going to take her.

Cross-examined, the witness said that he had told some parties in Johnson county what he knew about this case. He had talked to defendant's counsel about the case. He did not tell the counsel that the mare had a rope on her neck when he first saw her in company with defendant, and that he told defendant

not to take her, as some one might claim her, and that defendant said he would come and get her when no one knew it. When witness had his interview with counsel he was talking—he was swearing now.

Tom Coulter testified, for the State, that he saw the defendant in Cleburne, Johnson county, about the first of August, 1883, in possession of a black mare and colt answering the description of the animals alleged to be stolen, except that the brand on the mare's thigh was UP. The colt had been cut, evidently by a wire fence. The defendant employed the witness to take the animals to his, defendant's, father's.

William Brigman was the first witness for the defense. He testified that he lived near Waxahachie, in Ellis county. In the early part of 1882, the witness sold the defendant all the stock he owned in the UP and WPB brand. Witness and defendant had their first conversation about the sale at Auburn, near the line of Ellis and Johnson counties, in the presence of another man whom witness did not know. The trade was afterward closed by witness and defendant in the county clerk's office, in Waxahachie, in the presence of Mr Hawkins, county clerk, who drew up the bill of sale. There was a full understanding, which was embodied in the bill of sale. Witness then told defendant that the larger number of horses he had sold since he owned the brand had been shipped, but that three or four horses he had sold had not been shipped. Witness, prior to the sale to defendant, sold Mr. Marchbanks, living near Waxahachie, a black mare, fifteen hands high, branded UP on the thigh. This animal had an enlarged leg. Witness did not tell the defendant about the sale of this mare to Marchbanks. Witness bought the stock from Eslinger, and owned it but a short time. This mare and another animal had the UP brand on the thigh; all others that witness ever saw had it on the shoulder. Witness told the defendant that the only animal he had previously sold, and which he knew to be in the range, was a small black pony he had sold to one Jones. Defendant afterward got that horse up for Jones. Witness also told the defendant that he had been told of a UP mare running on Waxahachie creek.

Witness was here handed a paper on which he identified his signature. It was too much worn to disclose its original contents. The bill of sale conveyed to the defendant all of the interest of the witness in and to the stocks of horses branded UP on the shoulder and UPB on the thigh. [In the statement of

facts, this last brand is written in some places UPB, and in others WPB.] The bill of sale provided that such of the stock in the brands described as had other brands were not conveyed. This provision was inserted to protect parties who had previously purchased horse stock from the witness. When witness sold a horse before he sold the brand to the defendant, he invariably instructed the purchaser to put on another brand.

Jim Mathews testified, for the defendant, that he was present at Auburn when the defendant and Brigman made the preliminary trade for the UP brand of horses. He was not present when the bill- of sale was executed. Defendant has since claimed the UP brand.

W. C. Banks testified, for the defense, that, in the spring or summer of 1882, the defendant told him that he had purchased the UP and UPB brand of horses from Brigman, and asked witness to sign his note to Brigman for a balance of twenty-five dollars purchase money. Witness signed the note as surety. Defendant subsequently paid the note.

Mr. Prewitt testified, for the defense, that, in October or November, 1882, the defendant told him that he had bought the UP brand of horses. Witness told him that he had seen a black mare in that brand on Onion creek. Defendant told witness he would give witness five dollars to get her up. He afterwar 1 wrote the witness that he had found the mare, and would get her himself.

Mark Fletcher, defendant's brother, testified that defendant owned the UP stock of horses running in Johnson county. The brand is not located on any particular part of the body, being in some instances on the left and in others on the right shoulder, and again on one or the other thigh. The figures 77 appear on the neck of these horses.

Mr. Meadows, senior, testified that he established the UP horse brand about nine years before this trial. He sold the brand to his son, who took the stock to Comanche county. The brand was not confined to any particular part of the body, but was put on either shoulder or thigh, whichever chanced to be most convenient at the time of branding. Defendant never asked witness about the brand, but witness had told his brother, John Fletcher, that the brand was not confined to either shoulder or thigh.

Mr. Meadows, junior, corroborated his father in detail, and stated, in addition, that when he purchased the stock of his.

father he put the 77 brand on the neck. When he brought the stock back from Comanche county, he sold the brand and stock to Mr. Eslinger.

The defense then introduced in evidence the following letter, identified by the witness Keiningham:

"CLEBURNE, Nov'r 7, 1883.

"Mr. Keiningham:

"SIR: I received your letter to-day in regard to the old black mare. I got the mare, but did not get her through any mistake. I had been told where the mare was by different parties, but did not know that anybody claimed her. I bought the stock of horses from W. P. Brigman, at Waxahachie, about two years ago, and you can see record of sale in B. F. Hawkins's office, C. C. Ellis county. As ever,

"JIM FLETCHER.

"P. S.—The mare has been gone two months. If she comes back, let me know."

The defense then introduced a bill of sale signed by W. P. Brigman and acknowledged before the county clerk. That part showing the brand and description of the stock conveyed, and that part containing the reservation alluded to by witness Brigman, were torn out.

Errors in the charge, in refusing requested charges, in refusing an application for continuance, and the insufficiency of the evidence, were the questions raised by the motion for new trial.

*Poindexter & Padelford*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WILLSON, JUDGE. In our opinion this conviction is not sustained by the evidence. It is not shown beyond a reasonable doubt that the mare and colt were the property of H. W. Keiningham at the time the same were taken by defendant. Keiningham testified that he owned a mare and colt, which his son purchased from one Marchbanks, and this mare and colt were shown by other testimony to be the same that were taken by defendant, although Keiningham described the brand upon the mare incorrectly. But Keiningham did not state when he was the owner of said mare and colt, whether at the time of or sub-

sequent to the alleged taking of her by the defendant, or whether *before* or *after* the presentment of this indictment. If he was not the owner of the mare and colt at the time they were taken by the defendant, as alleged in the indictment, this conviction could not be sustained, because there would be a material and fatal variance between the allegation and the proof. It was essential, therefore, for the State to prove the ownership as alleged, and that such ownership existed at the time of the taking of the property. This proof, in our opinion, the State failed to make.

Again: The evidence fails to establish beyond a reasonable doubt the most essential element of this offense, that is, a *fraudulent intent* on the part of the defendant in taking the animals. There are some slight circumstances tending to show such intent, but on the other hand the decided preponderance of the testimony is, we think, the other way, and supports the defense that defendant took the property in good faith, under an honest belief that it belonged to him.

There are no questions of law presented by the record that need be discussed. Because the verdict is not supported by the evidence the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered June 27, 1884.